This point will hear Feiliks International versus Feiliks Global. Good morning. Good morning. May it please the court. I'm Paul Sarkozy from the law firm of Tannenbaum Helper in Syracuse and Hurstred. I'm actually joined by my colleague today, Amanda Leone. I first want to thank the panel for granting the request of appellants to have this oral argument. I want to focus the oral argument on one issue, an issue that is being raised only by appellant Feiliks International Logistics Hong Kong Limited. There are four Feiliks entities here. Feiliks International Logistics Hong Kong Limited, which is Feiliks Hong Kong, that entity entered into a loan agreement with defendant appellee Feiliks Global Logistics Corp. Feiliks U.S. It is that loan agreement and that loan agreement only I want to discuss. There are two other entities, Feiliks Logistics PTE Limited, which I'll refer to as Feiliks Singapore. There is also Jiangsu Feiliks International Logistics Inc., that is Feiliks China. But I want to focus on Feiliks Hong Kong and Feiliks U.S. And the reason I want to focus on that is because I'm going to ask this court respectfully that it reverse the district court's dismissal of Feiliks Hong Kong's claim for breach of the loan agreement and instead direct the judgment be entered in the amount of $300,000 amount of the loan. The reason for that is the court below found that the payment obligation of Feiliks U.S. was excused. It's a little unclear whether it was based on frustration of performance or frustration of purpose. But respectfully, it was clear error by the district court to find that Feiliks Hong Kong had either frustrated purpose or frustrated performance. There is nothing in the record about the conduct of Feiliks Hong Kong. Let me elaborate just a little bit. I'm going to start first with the frustration of purpose issue, which was raised and was briefed by the parties. The purpose of the loan was set forth, and you can see it on A0025. The express purpose of the loan was application of FMC bond. There was a $300,000. Repeat the last sentence. Sure. The loan agreement that I'm referring to is at A0025 in the first appendix. And if you look on that page, you'll see the purpose of the loan, of the $300,000 loan, was application of FMC bond. The funds were to be used, and if you look at A431 lines 9 through 14, Defendant Wei, who was the person operating Feiliks U.S., said, I said to her that this is a very new company, and we have no financial reports whatsoever to provide. I need some of capital money to deal with the insurance broker, because the agent said, if you have this kind of large sum of capital, it will be easier to get the FMC approval for the license. So the $300,000 was obtained from Feiliks Hong Kong. Actually, only $75,000 of it had to be used, and it was used to get a letter of credit that supported a bond. So the purpose of the loan, which was to obtain a bond, was achieved. There's no question on that. What the issue really turns on in this case is the loan wasn't repaid. What happened to the other $225,000? The other $225,000 appears to have been used for ongoing resources of the business of Feiliks U.S. during the one-year period. However, there was testimony- By Senator Linder? No. And the reason I say no is there's nothing in the record to say that it was done with the consent of the lender. Why? The only basis that I can see in the record is there were communications. First of all, no consent of the lender was needed, really, I don't think, as to how the funds would be used. It was a $300,000 loan for a period of a year. But then, and I think the issue comes up in Exhibit H, in the supplemental appendix of the appellees, there is a series of e-mail correspondence. It is primarily between Regina Tay. Regina Tay was the owner of Feiliks Singapore and was also the general manager of Feiliks U.S. And there's discussion between Regina and Amy Way, the controller of Feiliks U.S., about what should happen with the funds. But the lender was Feiliks Hong Kong. And it was, in fact, the district court below that emphasized that fact. Because the district court said Feiliks Singapore had no basis to sue under the promissory note. It wasn't a party to the loan agreement. So, again, I ask the court here to search the record. And respectfully, if you look through the record, the big argument that's raised is that there was diversion of business, such that Feiliks U.S. might have some difficulty repaying. Well, first I'd say that if you look at A3014, you will see that Feiliks' U.S. controller, Amy Way, testified that Feiliks U.S. did have enough money in April of 2014 to pay. Can I ask you something else? Sure. The argument you're making here, the loan issue, is it raised in your brief? The issue that is raised in the brief, and it's discussed in part in the discussion of the parties as to whether or not there was frustration of purpose and frustration of performance. There was not, I'll be clear, in the briefing a specific focus on Feiliks Hong Kong. But there was. How then is the question properly before us? I'd say that it's properly before it because there's a question as to whether the record, and this was specifically presented, contains any evidence advanced on frustrating the contract. And so, therefore, the issue generally was. It argues frustration of purpose. Right. And also frustration of performance is one of the issues that's addressed in the appellee's opposition. They go chapter and verse. But how does that help you? How does that help me? How does that help you if you didn't raise it? I would say that the issue of whether or not the court below committed clear error in finding an affirmative defense of frustration of performance or purpose was generally stated. And I would submit that the record and even the examples, and appellee will have a chance to respond, that are given in appellee's brief. None of them, none, address Feiliks Hong Kong. It was just simply a mistake. Thank you. May it please the court. Good morning. Vincent Chirico for the appellee's Feiliks Global Logistics Corp, which is Feiliks U.S., and Amy Quan Chi Wei. To answer Judge Kaplan's question, that issue was not, in fact, raised on appeal or briefed. And it's sort of a tangential issue to what Judge Kogan indicated below, regarding the issue as to whether this loan agreement was sufficiently definite to exclude any parole evidence regarding the intent of the loan. And I think on that, the trial court was absolutely right. This loan agreement did not have any specific end date, and specifically in the loan agreement itself, it says subject to future negotiations. And clearly, Judge Kogan reviewed the law and held that where material term requires future negotiations, that contract in itself is not admissible, is not enforceable, rather. So that opened up the issues regarding parole evidence and what the intent of this loan was. Here, Regina Tay, the principal of Feiliks Singapore, testified that the loan proceeds could be used, in fact, to temporarily lay out duties and expenses and cash flow. Wei, Amy Wei. There was an email exchange between Felix Global and, I believe, Tay, but I may misremember it, about the $225,000 being used for working capital at some point, after the $75,000 was advanced. Forgive me for my voice. But I don't know how that bears on Hong Kong. It does only peripherally, Your Honor. Only to indicate that there was a plethora of testimony regarding the intent and the use of these loan proceeds. With regard to Hong Kong- Tay's testimony relying on is testimony about her subjective view of what it was for. That's not true. That's true. And that doesn't, that shouldn't come in under the parole evidence rule in any case, right? That's true, Your Honor. But it's also beside the point, because as to Hong Kong, there's testimony that the entire $300,000 loan proceeds, which explicitly in the contract indicated they were to be used for obtaining the FMC license and the NVOCC license. This testimony by Mr. Cunningham, who's Felix U.S.'s consultant with regard to the licensing, that the company, Felix U.S., had to retain and restrict the $300,000 for at least a year in order for the license to be granted. And that's in the appendix at page 365. So that, I submit, is the evidence with regard to the loan between Felix Hong Kong and it applies to Felix Hong Kong and Felix U.S. But this is only one of the various arguments that were decided by Judge Kogan after full bench trial. And therefore, this court has to review this appeal based on the abuse of discretion standard. We submit that there is absolutely no clear error of law here. There is no material error of fact in any of the causes of action, whether they are the breach of contract action or the breach of fiduciary duty action. With regard to the breach of contract action, the lower court held that there was no breach because of four particular reasons. Not just the one that my adversary cogently submits. The first one, of course, which is admitted and not addressed in the brief, is that Felix Singapore was not a party to the contract, to the loan agreement. The second is that Amy Way cannot be held personally liable for a loan executed between Felix Hong Kong and Felix U.S. The third reason we've already addressed, which is the parole evidence regarding the purpose of the loan. And the fourth reason is the undermining, the frustration of purpose argument that considerable testimony was had during the course of this four day bench trial. And clearly, that evidence is undisputed. Once Amy Way, as manager and controller of Felix U.S., started disagreeing with her partner about the way in which money was misspent or mismanaged regarding renting an extra office, renting an apartment, hiring possibly incompetent personnel. Once she started complaining about that, that was the trigger for all of the events that followed, including the beginning of the diversion of all of Felix U.S.'s business. Which is also undisputed, in fact, Ms. Tate testified and admitted under oath that they did in fact systematically, directly, intentionally divert not only all of the businesses from Jiangsu Felix or Felix China, which was one of the top customers. But also all of the business that Amy Way had poured into the joint venture from her own separate company for America. They diverted all of that within a couple of months and then immediately requested that Felix U.S. repay the loan. I'm sorry, Your Honor. Please remind me of what, if any, connection there was between Tate and Hong Kong. Tate is the 49% shareholder of Felix Singapore. Felix Singapore is owned in part by Felix Hong Kong. So there's an indirect combination of personnel for all of these companies, both Felix China, Felix Hong Kong, Felix Singapore. They're all interrelated with common directors, common shareholders, parent subsidiaries and affiliates. Your position, I take it in response to Mr. Sarkozy's new argument today, is essentially that Tate's actions alone or with others to divert the business from U.S. is attributable to Hong Kong. That's correct, Your Honor. And in fact, there's testimony in the record that many of these discussions were done at Gavin Yau's behest. Gavin Yau is the chairman of Felix Hong Kong. So Mr. Yau... Let's see. That was... A291 to 292 and A455 to 457 and A460. That is testimony regarding a meeting held in Taipei with Regina Tate and Gavin Yau and Julia Guo, who is the Felix China vice president, regarding the issues of the employee's termination. Just give me the first of those page references again. Sure. A291 to 292. I got the rest. Okay. And the testimony there indicates that Mr. Yau was intimately involved in the day-to-day operations of Felix U.S. by virtue of his relationship with Felix Singapore and its principal shareholder, Regina Tate. So with regard to the breach of contract action, there's no question that Judge Kogan reviewed the evidence, heard the testimony, and came out with a well-reasoned, well-supported decision on the breach of contract issue. The lower court also, I believe, got the breach of fiduciary duty claims right, both on the plaintiff's claims as well as on the counterclaims for Ms. Wei. There are two reasons why there was no breach of fiduciary duty by Ms. Wei. The first is, well, first of all, there was no evidence of a breach. The testimony indisputably indicates that Ms. Wei acted in good faith at all times, ensured that Felix U.S. was able to operate by virtue of temporary use of For America licenses. She poured her entire life savings and entire client base from her own company into Felix U.S. and did not personally profit from any relationship between the joint venture partners. The court also correctly held that there's no fiduciary relationship between Wei and Felix Hong Kong because their relationship was one between lender and lender. The court also correctly held that the counterclaims on behalf of Ms. Wei were in fact properly granted because there was a plethora of evidence regarding that diversion of business and the loss of Ms. Wei's livelihood over the prior 25 years. Thank you. If I may, let me start first with the diversion of business. The diversion of business as testified to by Ms. Wei at A712, lines 16 and 17. The entities that she identifies that were engaged in the diversion of business were Felix China, Felix Singapore, owned by Ms. Tay, in part, and Skylift Singapore, which was owned by Ms. Tay. But that overlooks the testimony that your adversary just cited, which does talk about the meeting in Taipei with Yao, who is Hong Kong. Absolutely. Right? And she was then asked, was there a change in the business relationship, I'm at page 8460, between Felix U.S. and the other Felix entities after the incident that Regina gave some warning to this guy, Pooh or Pew, they changed the relationship with him, and she says, and then Felix China stopped giving Felix U.S.A. a total of 68 customers. Business was diverted and so forth. Now, it's not exactly the missing 18 and a half minutes of the Watergate tape, but why wasn't Judge Kogan well within his rights to find that the relationship changed and the diversion began as a direct result of this meeting in Taipei at which Yao and the others all were present and people were quite unhappy about what had happened with respect to Mr. Pew. That meeting happened in November 2013. The testimony of Ms. Wei was that the diversion began on April 2nd, 2014. That's at A484, lines 17 and 18. That is a huge gap in time in the interim, and moreover, the testimony was primarily about Ms. Tay's instructions. I think to make a link back to Felix Hong Kong, where you have the testimony expressly, and in each instance, if you look at Apelli's brief and all of the record sites on pages 38 to 40 about the diversion, if you look at the transcript, it's all about Skylift, Felix. They were the people who carried it out. That's the point. I understand, but I believe it is a huge leap to... Explain to me, if you will, how we could possibly say that on this record, Judge Kogan's finding was clearly erroneous. I'd say that it's pure speculation that he engaged in that Felix Hong Kong, because also remember Mr. Yao also had responsibilities at Felix China. That's true, but you have to figure out which is the entity that is frustrating the purpose, and if there's no link to... And there is, I would respectfully submit, a state court action. What was Yao's connection to Hong Kong? He was a director of Hong Kong, but there is no link anywhere in the record about Yao in his capacity as Hong Kong, or frankly even Yao in his capacity on China directing any diversion. There's nothing there. Go back to a really basic question. Why does your client, Felix Singapore, have to sue Felix US to do anything when Singapore owns 80% of it? There is... I mean, it should be pretty easy. It's not, and the reason it's not are a couplefold. First, for Felix US to get rid of, to insist or affect anything, it would need to have a US citizen or a licensed person at Felix US to be able to continue the business. That person was Ms. Wei, and Ms. Wei separately brought an action in state court where she raised issues concerning Felix Singapore, Ms. Tay, and Mr. Yao. So, look, if there were breaches of duty, those things are being handled... You may worry about whether your adversary company can continue doing business, but if Felix Singapore wants money from Felix US and owns 80% of it, I guess it can just say, pay. It can say it, but just because it says it doesn't mean that Ms. Wei is going to... You want a court to say it, right? Yes, and that issue is being... Assuming these companies are organized on some regular basis. They weren't. There were no directors in place. There hadn't been organizational meetings. I understand, and so we came to court. There's risks in lending $300,000 to a company that you are in the perfect position to know is irregularly organized and operated on some captious and unknowable basis. Isn't there? There is, respectfully, but that doesn't mean that the legal basis of frustration of performance was met here, and that's the excuse that legally the court below relied on. And you want us to respect all of these, the separateness of all of these companies, none of which are anything more than something in somebody's imagination for the purpose of saying you're not responsible for the diversion, but we should understand that they really are nothing for other purposes. I wouldn't say that. Phelix China is a publicly held company and operates that way, and I would say that the court below drew upon that distinction in its determination that Phelix Singapore couldn't sue. So what's sauce for the goose should be sauce for the gander.